DOLORES GONZÁLEZ, Plaintiff and Appellee, v. JOSÉ FRANCISCO SALIB, Defendant; WHITE STAR BUS LINE, INC., Defendant and Appellant.

No. 7195. Argued March 25, 1938.—Decided July 28, 1938.

*Celestino Iriarte, F. Fernández Cuyar,* and *H. González Blanes* for appellant. *Dubón & Ochoteco* for appellee.

Mr. Chief Justice Del Toro delivered the opinion of the court.

Dolores González brought an action against the White Star Bus Line, Inc., a public service corporation engaged in the transportation of passengers, and José Francisco Salib, of legal age and a resident of San Juan, to recover the sum of $1,500 as damages suffered by her in consequence of an accident that occurred as follows:

On June 12, 1934, at 12:00 p.m., the plaintiff was traveling as a passenger for hire in a motor bus of the White Star Bus Line along Ponce de León Avenue. When approaching Stop 10, the bus, which was operated by a chauffeur of the company, collided with an automobile driven by the defendant Salib.

According to the plaintiff, the collision was due to the fault, negligence, or unskillfulness of both drivers, causing the fracture of plaintiff's sixth cervical vertebra, a severe bruise in her chest, other bruises in various parts of her body, and nervous depression, for which injuries she claimed the aforesaid sum as damages, including physical pain, mental anguish, and moral suffering.

The White Star Bus Line asked for a bill of particulars which the plaintiff furnished and which reads, in short, as follows:

"The fault, negligence, inexperience and carelessness of chauffeur Aniceto Salamán employed by defendant White Star Bus Line, Inc. . . . consisted in stopping . . . . violently and suddenly the said bus . . . . at a place distant from the authorized stop for this bus . . . . without giving any warning to the passengers . . . . without signalling with his hand, or making any other signal. . . ."

The defendant White Star Bus Line answered and admitted the first two paragraphs of the complaint but denied that its motor bus had collided with the automobile of its code-

fendant, Salib, or that the collision was due to the fault, negligence, or unskillfulness of its chauffeur, or that the plaintiff had suffered the injuries specified by her, or that she needed hospitalization, or that she had suffered damages amounting to $1,500 or any other sum.

It set up as special defenses that if the plaintiff has suffered any injury, this was due exclusively to the negligence of the codefendant Salib who, at the time and place mentioned, was driving his car absolutely without care and without paying attention to the vehicles in front of him and collided with the motor bus when the latter was stopped at the request of a passenger; that the accident was not caused by its fault or negligence, because its chauffeur was driving the motor bus at a moderate speed along its right and stopped it when requested by a passenger gradually and after making the proper signal; and that the complaint does not state facts sufficient to constitute a cause of action.

The case went to trial. Both the plaintiff and the defendants appeared through their counsel and submitted their evidence which was weighed by the court as follows:

"After considering the evidence as a whole, we reach the firm, definite, and absolute conclusion that both defendants contributed to bring about the accident and that both are liable for the injury suffered by the plaintiff. . . . The plaintiff was confined in the Clínica Santurce for treatment and was there attended by Dr. Reyes. The latter testified that she did not receive any trauma or injury whatever and yet she complained of pain in the neck and chest. An X-ray photograph was taken but no fracture appeared. After five days she was discharged from the hospital. The plaintiff then went to her home where she was attended by Dr. Rafael Maldonado who 'suspected that possibly a vertebra had been fractured.' She complained of pain in her chest and head and she spat blood. Finally Dr. Ruiz Cestero, who examined the radiographs taken in the Clínica Santurce as well as those taken in the Clínica Miramar and which were admitted by us in evidence, testified that the said radiographs failed to show any signs of fracture but that he noticed a bone lesion between the sixth and the seventh vertebrae that in his opinion was the result of hypertrophic arthritis rather old,

an illness of an infectious character, but which was not caused by any trauma. . . . The fact that a person is suffering from a malady can not be an excuse for refusing to him any compensation to which he may be entitled, because if, as happens in the instant case, the plaintiff was suffering from arthritism (a condition that does not appear from the evidence but which we concede for the sake of argument) and the shock produced by the collision hastened, rendered acute, or provoked an arthritic attack, causing damage and suffering, the latter, being chargeable to the defendants, entitle the injured person to compensation. See the same doctrine upheld in *Muñoz* v. *Escudero*, 42 P.R.R. 521. We hold that there was no fracture, but certainly there was physical pain, mental anguish, and moral suffering that should be compensated. The statement from the physician that she spat blood has not been contradicted. Such spitting of blood is not necessarily produced by a serious trauma or fracture of the ribs or injury to the lungs.''

The evidence thus weighed was, for the most part, long, cumulative, unnecessary, and confusing. We have examined it in its entirety. We will select therefrom salient portions of the testimony taken, which, to our judgment, bring out the substance of the case. The plaintiff testified thus:

''After crossing the Puente del Agua on its way to Stop 10. . . the motor bus gave a jerk. . . shook. . . stopped and then there was a collision and I was hurt . . . by the seat in front and the one where I was sitting . . . I was taken to a hospital in Santurce . . . I was attended by several physicians . . . and after five days I had to leave the clinic. . . I was hurt in the chest and in the head. . . The bus stopped before the collision. . . unexpectedly. . . past the Puente del Agua and before reaching the authorized stop. . . I was carried from the clinic in an ambulance, suffering from shivers, headaches, constant nausea, faintings, bloody spits, swellings. . . in the neck region, and the chest region was very painful. . . The pain in the neck eased a little after five months but continued always; now and then I had faintings; suddenly I would swoon, and when I went to work I had to absent myself many times, . . . .''

Aniceto Salamán, the chauffeur, stated that—

''While crossing the bridge I heard a passenger say to me: 'Stop, a parcel has dropped out.' I swerved to the right and stopped the

bus. While I was getting up from my seat in order to go and fetch the parcel, a car. . . the collision. After the collision I did not climb down to get the parcel, as everybody was alarmed. . .'' He knows the plaintiff. . . ''she was one of the passengers in the bus. . . he did not take her to any place. . . to any clinic. . . it was she who said she was ill and that she was sick . . . that she felt she was hurt.'' He then admitted that ''he took her to the Clínica Santurce . . . at her request, that she said she was sick. . . that she felt sick, that he should take. her to a clinic.''

In answer to the question: ''When you applied the brakes and looked through that glass, did you see the car with which your vehicle collided?'' he answered: ''No . . . because that bus was carrying five or six passengers standing at that moment and he could not see any vehicle coming behind; no matter how far back it was coming it was impossible to see the same because of the passengers behind me.''

On being questioned whether he signalled at the time he stopped, he answered: ''. . . . . it is difficult to put out one's hand, because if you put out your hand, only your fingers may be seen. . . . The only signal I made was the 'stop' signal carried by the bus. . . . It is a red lamp at the rear of the bus with the word 'stop' in the middle of the glass.''

Codefendant Salib testified:

''I was travelling from here towards Santurce and when crossing Puente del Agua a bus going in front of me stopped violently and I tried to pass, but as there was traffic coming from Santurce I was unable to pass and tried to avoid the collision, but notwithstanding that I collided with the bus.''

Francisco Alazón, a policeman who did not see the accident but who went immediately to the place to make an investigation, testified that Salamán told him that ''he had dropped a package and that on stopping he felt a collision from behind.'' And that Salib told him ''that the bus stopped and he was following near, that he had collided with the bus, and that he had no time to swerve to the left . . . . . that the bus had stopped on the right side.''

He further testified that the plaintiff alighted by herself from the bus and told him that she had been hurt in her chest, and that the chauffeur himself took her to a clinic.

Dr. Rafael Maldonado testified that "the father of the girl took her to the first-aid station in the Barrio Obrero . . . . . to be examined and treated by him, but when he saw that it could be necessary to take an X-ray photograph in order to determine her condition . . . he sent her to the Municipal Hospital . . ."

After the radiograph had been taken, he saw it together with "Dr. Sierra, Dr. Díaz García, and Dr. Comas . . . we were of the opinion, judging from the radiograph, that there was a fracture . . ." He could not proceed with his statement because the other party objected and the court sustained the objection. In answer to other questions he said that he had suggested "to the patient to stay in bed all the time, without moving at all . . . . . because I thought that was the proper treatment . . . . for a fracture."

He visited the patient many times. He examined her chest and found it apparently normal. The first time he examined her he noticed some particles of blood in her spittle after coughing.

Dr. Antonio R. Reyes of the Clínica Santurce testified that the plaintiff was admitted to the clinic at 12.25 p.m. on June 12, 1934, and left on the 16th. The record fails to mention the person who took her there. He treated her at the request of the White Star Bus Line. "The examination made reveals a young girl poorly developed; there is no recent sign of trauma, but she alleges that she had a trauma (this was jotted down in English) when she arrived. . . . . Radiographs of her were taken. No decoloration of the skin or otherwise appeared to show a trauma. She complained of pains . . . . . was administered aspirin for the pains; ice packs were applied to her neck, and as there were no signs of anything else, nothing further was done to her."

She left the clinic "because being fit for discharge, we did discharge her precisely because we failed to find anything the matter with her to justify her being confined."

On leaving she said "that she spat a little blood . . . . that she had pains in the chest . . . . . that her neck was painful."

To the question "Why did you then allow this patient to leave the hospital?" he answered "Because she did not have any injury showing pathological symptoms."

Félix Robles, a witness for the White Star Bus Line, testified that he was travelling in the motor bus; that "in the Puente del Agua, on our way to Santurce, the chauffeur stopped the bus and shortly after that a car following behind collided with the bus . . . . The bus was crowded because it was after twelve, half-past twelve, when people leave the offices." He did not notice whether any passenger fell forward. He did not fall.

Dr. Ruiz Cestero, who is a surgeon, after examining two radiographs introduced in evidence and admitted without objection, testified in regard to the first that he could not tell whether or not there was any fracture, and in regard to the second, that no fracture "appears from this second radiograph viewed in this way, because there is a lesion in the sixth cervical vertebra. The radiographic signs appearing in this place indicate what we call an old hypertrophic arthritis . . . . It is old, of course . . . . Arthritis is usually due to an infectious process."

Seven errors are assigned in the brief of the appellant.

The first two assignments refer to the weighing of the evidence; the third, to the application of the rule that where an injury results from the concurrent negligence of several persons the latter are liable jointly and severally; the fourth, in rendering judgment in favor of the plaintiff in the basis of negligent acts which had not been alleged; the fifth and the sixth, in assessing the amount of damages upon erroneous

grounds; and the seventh in imposing costs, disbursements, and attorney's fees.

All the assignments have been fully argued, with citation of a great many authorities. They have likewise been answered by the plaintiff. The defendant Salib has not intervened in this appeal.

To our mind, the judgment appealed from finds support in the pleadings and the evidence. The negligence of the defendant in stopping the bus at the place, in the manner, and at the time it did, is manifest. It is quite possible that if Salib, the other defendant, had been an expert driver and had realized from the first what the driver of the motor bus was going to do, he might have avoided the collision by quickly swerving his car. This however, does not relieve the White Star Bus Line from responsibility as the owner of the motor bus, as a public carrier on whose skill the plaintiff as a passenger for hire relied. The cases of *Cruz et al.* v. *Frau*, 31 P.R.R. 87, and *Cubano* v. *Jiménez et al.*, 32 P.R.R. 155, were, therefore, properly applied by the court. The collision was due to the concurrent negligence of both defendants and in accordance with the law and the jurisprudence, both of them are liable.

As to the damages actually suffered, the case indeed is not very clear. The evidence is conflicting and that which favors the plaintiff fails to establish all of the allegations of the complaint. The existence of a fracture as the result of the collision is very questionable. The trial court itself eliminated it as an established fact. But there remains the blow, the spitting of blood, the pains, all of which although less serious is covered by the averments of the complaint. The sum of $600 allowed by the court as compensation is not so excessive as to call for a reduction, especially as we shall hold that the last assignment of error is well-founded.

We refer to the imposition of costs including attorney's fees. The costs, as such, must stand, but the attorney's fees, in view of the attendant circumstances, must be excluded.

636

We do not think that the defendant and appellant showed obstinacy in defending its case.

For the reasons stated, the judgment appealed from is modified so as to adjudge the defendants to pay the costs without including therein attorney's fees, and as so modified, the judgment is affirmed.

Mr. Justice De Jesús took no part in the decision of this case.